# United States Court of Appeals for the Federal Circuit

---

**IN RE: GOOGLE LLC,**
*Petitioner*

---

2019-126

---

On Petition for Writ of Mandamus to the United States District Court for the Eastern District of Texas in Nos. 2:18-cv-00462-JRG, 2:18-cv-00463-JRG, Judge J. Rodney Gilstrap.

---

**ON PETITION**

---

THOMAS SCHMIDT, Hogan Lovells US LLP, New York, NY, argued for petitioner. Also represented by NEAL KUMAR KATYAL, KEITH O'DOHERTY, Washington, DC.

JEFFREY BRAGALONE, Bragalone Conroy PC, Dallas, TX, argued for respondent Super Interconnect Technologies LLC. Also represented by THOMAS WILLIAM KENNEDY, JR., DANIEL FLETCHER OLEJKO.

CLEMENT ROBERTS, Orrick, Herrington & Sutcliffe LLP, San Francisco, CA, for amici curiae Acushnet Company, BigCommerce, Inc., ChargePoint, Inc., Check Point Software Technologies, Inc., DISH Network, L.L.C., eBay Inc., Fitbit, Inc., Garmin International, Inc., High Tech Inventor's Alliance, HP Inc., L Brands, Inc., Netflix, Inc., Quantum Corporation, RingCentral, Inc., Twitter, Inc.,

Walmart, Inc., Williams-Sonoma, Inc. Also represented by ABIGAIL COLELLA, New York, NY; ERIC SHUMSKY, Washington, DC.

BRENT P. LORIMER, Workman Nydegger, Salt Lake City, UT, for amicus curiae Merit Medical Systems, Inc.

---

Before DYK, WALLACH, and TARANTO, *Circuit Judges*.

Order for the court filed by *Circuit Judge* DYK.

Concurrence filed by *Circuit Judge* WALLACH.

DYK, *Circuit Judge*.

**O R D E R**

Google LLC ("Google") petitions for a writ of mandamus ordering the United States District Court for the Eastern District of Texas to dismiss the case for lack of venue. *See Super Interconnect Techs. LLC v. Google LLC*, No. 2:18-CV-00463-JRG, 2019 U.S. Dist. LEXIS 132005 (E.D. Tex. Aug. 7, 2019). We hold that mandamus is warranted and order that the case either be dismissed or transferred.

BACKGROUND

Super Interconnect Technologies LLC ("SIT") sued Google for patent infringement in the Eastern District of Texas. Under the patent venue statute, 28 U.S.C. § 1400(b), "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." SIT filed its suit after the Supreme Court's decision in *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514, 1517 (2017), which held that "a domestic corporation 'resides' only in its State of incorporation for purposes of the patent venue statute," and this court's decision in *In re Cray, Inc.*, 871 F.3d 1355, 1360

(Fed. Cir. 2017), which held that a "regular and established place of business" under the patent venue statute must be: (1) "a physical place in the district"; (2) "regular and established"; and (3) "the place of the defendant."

SIT alleged that "venue is proper . . . under 28 U.S.C. § 1400(b) because Google has committed acts of infringement in the District and has a regular and established place of business in this District." *Super Interconnect*, 2019 U.S. Dist. LEXIS 132005, at *3. Google's business includes providing video and advertising services to residents of the Eastern District of Texas through the Internet. SIT's allegation of venue was based on the presence of several Google Global Cache ("GGC") servers, which function as local caches for Google's data.[1]

The GGC servers are not hosted within datacenters owned by Google. Instead, Google contracts with internet service providers (ISPs) within the district to host Google's

---

[1] Google later withdrew its servers from the district but concedes that "Google's subsequent removal of the GGC servers from service in the Eastern District of Texas does not impact venue in this case." Pet. at 6. The regional circuits appear to be split on the exact timing for determining venue. *See, e.g.*, *Flowers Indus., Inc. v. FTC*, 835 F.2d 775, 776 n.1 (11th Cir. 1987) (holding that "venue must be determined based on the facts at the time of filing"); *Welch Sci. Co. v. Human Eng'g Inst., Inc.*, 416 F.2d 32, 35 (7th Cir. 1969) (holding that venue is proper if the defendant had a "regular and established place of business at the time the cause of action accrued and the suit is filed within a reasonable time thereafter"). We need not decide the correct standard, because the GGC servers were present in the district both at the time the cause of action accrued and at the time the complaint was filed. For convenience, we refer to the facts relating to Google's servers in the district in the present tense throughout this opinion.

GGC servers within the ISP's datacenter. When a user requests Google's content, the ISP attempts to route the user's request to a GGC server within its own network (within the district) before routing the request to Google's central data storage servers (outside the district). The GGC servers cache only a small portion of content that is popular with nearby users but can serve that content at lower latency—which translates to shorter wait times—than Google's central server infrastructure. This performance benefit is in part due to the physical proximity of the GGC servers to the ISP's users. This arrangement allows Google to save on bandwidth costs and improve user experience on its various platforms.

At the time of the complaint, Google had entered into contracts with two ISPs to host GGC servers owned by Google in the Eastern District of Texas: Cable One Inc. ("Cable One") and Suddenlink Communications ("Suddenlink"). The contracts provided that the ISPs would host Google's GGC servers in their data centers. Specifically, the GGC servers are installed in the ISP's server racks, which are cabinets that accept standard server components. Each contract states that the ISP must provide "[r]ack space, power, network interfaces, and IP addresses," for the GGC servers, and provide "[n]etwork access between the [GGC servers] and [the ISP's] network subscribers." Supplemental Record, Dkt. 31, Ex. A, at 1; *id.*, Ex. B, at 1. The contracts permit the ISPs to select the rack space for the GGC servers, but they tightly restrict the ISPs' ability to relocate the servers without Google's permission once a location is selected. *Id.*, Ex. A, at 2; *id.*, Ex. B at 2. The contracts also strictly limit any unauthorized access to the space used by Google's servers. *Id.*, Ex. A, at 6–7; *id.*, Ex. B, at 5. The contracts state that the ISPs are required to provide "installation services," i.e., installing the GGC servers in the server racks. *Id.*, Ex. A, at 1; *id.*, Ex. B at 1. While the contracts forbid the ISPs to "access, use, or dispose of" the GGC servers without

Google's permission, *id.*, Ex. A, at 2; *id.*, Ex. B at 2, they also require the ISPs to provide "[r]emote assistance services," which "involve basic maintenance activities" performed on the GGC servers by the ISP's on-site technician, if requested by Google, *id.*, Ex. A, at 1, 6; *id.*, Ex. B, at 1, 5. It is undisputed that no Google employee performed installation of, performed maintenance on, or physically accessed any of the GGC servers hosted by Cable One or Suddenlink.

Google moved to dismiss the complaint for improper venue under 28 U.S.C. § 1406(a) and Federal Rule of Civil Procedure 12(b)(3). The district court denied Google's motion and, relying on its previous decision in *SEVEN Networks LLC v. Google LLC*, 315 F. Supp. 3d 933 (E.D. Tex. 2018), found that the GGC servers qualified as Google's "regular and established place of business" under the test articulated in *Cray*.

Google now petitions for a writ for mandamus directing the district court to dismiss the case for lack of venue under § 1400(b). Acushnet and 17 other companies filed an amicus brief in support of Google's petition. This court heard oral argument on December 13, 2019.

## DISCUSSION

### I

This court "may issue all writs necessary or appropriate in aid of [its] jurisdiction[] and agreeable to the usages and principles of law" under the All Writs Act. 28 U.S.C. § 1651(a). The Supreme Court has held that three conditions must be met before a writ may issue: (1) the petitioner "[must] have no other adequate means to attain . . . relief," (2) the petitioner must show that the right to mandamus is "clear and indisputable," and (3) the court must be "satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004) (first alteration in original) (internal quotation marks and citations omitted).

The Supreme Court has confirmed that the requirements for mandamus are satisfied when the district court's decision involves "basic" and "undecided" legal questions. *Schlagenhauf v. Holder*, 379 U.S. 104, 110 (1964). In such situations, a district court's order may constitute a "clear abuse of discretion" for which mandamus relief is the only adequate relief. *Id.* Applying *Schlagenhauf*, we have found mandamus "necessary to address the effect of the Supreme Court's decision in *TC Heartland*, which itself was yet another [improper-venue] case." *In re BigCommerce, Inc.*, 890 F.3d 978, 981 (Fed. Cir. 2018); *see also In re ZTE (USA) Inc.*, 890 F.3d 1008, 1011 (Fed. Cir. 2018); *In re Micron Tech., Inc.*, 875 F.3d 1091, 1095 (Fed. Cir. 2017); *Cray*, 871 F.3d at 1359.

In *SEVEN Networks*, the same district court found that venue was proper under what the district court characterized here as "identical facts." *Super Interconnect*, 2019 U.S. Dist. LEXIS 132005, at *4. Google also petitioned for mandamus in that case, and this court denied that petition on the ground that Google failed to show that the district court's ruling implicated the "special circumstances justifying mandamus review of certain basic, unsettled, recurring legal issues over which there is considerable litigation producing disparate results." *In re Google LLC*, No. 2018-152, 2018 U.S. App. LEXIS 31000, at *6 (Fed. Cir. Oct. 29, 2018) (citation omitted).

Our previous denial of mandamus was based on (1) our observation that "it [was] not known if the district court's ruling involves the kind of broad and fundamental legal questions relevant to § 1400(b) that we have deemed appropriate for mandamus," and (2) the lack of "disagreement among a large number of district courts." *Id.* We concluded that "it would be appropriate to allow the issue to percolate in the district courts so as to more clearly define the importance, scope, and nature of the issue for us to review." *Id.* Judge Reyna dissented from our decision, *id.*, at *10 (Reyna, J., dissenting), and dissented to the court's denial

of rehearing en banc, joined by Judge Newman and Judge Lourie, *In re Google LLC*, 914 F.3d 1377, 1378 (Fed. Cir. 2019) (Reyna, J., dissenting).

Since our decision in *Google*, three related developments have convinced us that mandamus is appropriate to resolve this venue issue. First, the prediction of our dissenting colleagues has proven accurate, and there are now a significant number of district court decisions that adopt conflicting views on the basic legal issues presented in this case.[2] Second, experience has shown that it is unlikely

---

[2] *In re Google LLC*, 914 F.3d 1377, 1380 (Fed. Cir. 2019) (Reyna, J., dissenting); *see, e.g.*, *CUPP Cybersecurity LLC v. Symantec Corp.*, No. 3:18-CV-01554, 2019 U.S. Dist. LEXIS 37960, at *7–8 (N.D. Tex. Jan. 16, 2019) (holding that the defendant's servers hosted in an datacenter operated by a third party were not a regular and established place of business); *CDX Diagnostic, Inc. v. US Endoscopy Grp., Inc.*, No. 13-CV-5669, 2018 U.S. Dist. LEXIS 87999, at *7 (S.D.N.Y. May 24, 2018) (holding that the defendant's storage units had "no 'employee or agent'" conducting business and were therefore not regular and established places of business); *Peerless Network, Inc. v. Blitz Telecom Consulting, LLC*, No. 17-CV-1725, 2018 U.S. Dist. LEXIS 49628, at *9 (S.D.N.Y. Mar. 26, 2018) (holding that a regular and established place of business "requires some employee or agent of the defendant to be conducting business at the location in question"); *Tinnus Enters., LLC v. Telebrands Corp.*, No. 6:17-CV-00170, 2018 U.S. Dist. LEXIS 79068, at *14 (E.D. Tex. Mar. 9, 2018) (holding that the defendant's leased shelf space in the district was a regular and established place of business where the defendant paid "agents to monitor, clean, restock, and affix price signage" to the shelf space); *Automated Packaging Sys. v. Free-Flow Packaging Int'l, Inc.*, No. 5:14-cv-2022, 2018 U.S. Dist.

that, as these cases proceed to trial, these issues will be preserved and presented to this court through the regular appellate process. "[W]hile an appeal will usually provide an adequate remedy for a defendant challenging the denial of an improper-venue motion, there may be circumstances in which it is inadequate." *In re HTC Corp.*, 889 F.3d 1349, 1354 (Fed. Cir. 2018). While not alone sufficient to justify mandamus, the substantial expense to the parties that would result from an erroneous district court decision confirms the inadequacy of appeal in this case. *See In re BP Lubricants USA, Inc.*, 637 F.3d 1307, 1313 (Fed. Cir. 2011) ("Not all circumstances in which a defendant will be forced to undergo the cost of discovery and trial warrant mandamus."). Finally, the wisdom of our decision to allow the issues to "percolate in the district courts" has been borne out, *Google*, 2018 U.S. App. LEXIS 31000, at *8, as additional district court decisions have crystallized and brought clarity to the issues: (1) whether a server rack, a shelf, or analogous space can be a "place of business" and (2) whether a "regular and established place of business" requires the

---

LEXIS 5910, at *27–28 (N.D. Ohio Jan. 12, 2018) (holding that the defendant's equipment that was "moved onto the customer's property, and may be removed by [the defendant] or relocated by the customer with [the defendant]'s permission, precludes any finding that this equipment could serve as a physical, geographical location" for purposes of establishing venue under § 1400(b)); *Pers. Audio, LLC v. Google, Inc.*, 280 F. Supp. 3d 922, 935 (E.D. Tex. 2017) (holding that Google's GGC servers were not regular and established places of business). *See also Rensselaer Polytechnic Inst. v. Amazon*, No. 1:18-cv-00549, 2019 U.S. Dist. LEXIS 136436, at *34, *36 (N.D.N.Y. Aug. 7, 2019) (noting that "[t]he Federal Circuit has not decided whether a natural person must conduct business at the location for it to be a 'place of business'").

regular presence of an employee or agent of the defendant conducting the business.[3] The district courts' decisions on these issues are in conflict. This court has not addressed this fundamental and recurring issue of patent law. We thus conclude that mandamus is an available remedy.

## II

Under *Cray*, there are three general requirements to establishing that the defendant has a regular and established place of business: "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant." 871 F.3d at 1360. Google's petition advances arguments addressed to the first and second *Cray* factors. First, it argues that a "place" must have the characteristics of a real property or leasehold interest. Second, it argues that a "place of business" requires a place where an employee or agent of the defendant is conducting the defendant's business.

The first question is whether the rack space occupied by the GGC servers constitutes a "place" under § 1400(b) as interpreted in *Cray*. As the court in *Cray* emphasized, "the first requirement [under § 1400(b)] is that there 'must be a physical place in the district.'" 871 F.3d at 1362. A "place" merely needs to be a "physical, geographical location in the district from which the business of the defendant is carried out." *Id.*

Google's petition suggests that a court's inquiry into whether the defendant has a physical "place of business" should focus on whether the defendant has real property ownership or a leasehold interest in real property. We hold that a "place" need not have such attributes. In *Cray*, we rejected the notion that a "virtual space" or "electronic

[3] *See also* Br. of Amicus Curiae Acushnet et al., at 12 n.3 (collecting cases involving these issues).

communications from one person to another" could constitute a regular and established place of business. 871 F.3d at 1362. Here, the GGC servers are physically located in the district in a fixed, geographic location. Indeed, *Cray* itself recognized that a "place of business" is not restricted to real property that the defendant must "own[] or lease," and that the statute could be satisfied by any physical place that the defendant could "possess[] or control." *Id.* at 1363 (discussing the third *Cray* factor). For example, a defendant who operates a table at a flea market may have established a place of business; the table serves as a "physical, geographical location . . . from which the business of the defendant is carried out." *Id.* at 1362; *see also In re Cordis Corp.*, 769 F.2d 733, 735, 737 (Fed. Cir. 1985) (suggesting that defendant's employees' homes, which were used to store the defendant's "literature, documents and products," could constitute a "regular and established place of business"). Similarly, leased shelf space or rack space can serve as a "place" under the statute, as two district courts have found. *See Tinnus Enters., LLC v. Telebrands Corp.*, No. 6:17-CV-00170, 2018 U.S. Dist. LEXIS 79068, at *14 (E.D. Tex. Mar. 9, 2018), *report and recommendation adopted*, 2018 U.S. Dist. LEXIS 78342 (E.D. Tex. May 1, 2018) (holding that "premium shelf space" leased by the defendant constituted a regular and established place of business); *Peerless Network, Inc. v. Blitz Telecom Consulting, LLC*, No. 17-CV-1725, 2018 U.S. Dist. LEXIS 49628, at *8–9 (S.D.N.Y. Mar. 26, 2018) (holding that shelf space constituted a "place" under the first factor of the *Cray* test).

We agree, however, with Google's alternative argument that under the second *Cray* factor, a "place of business" generally requires an employee or agent of the defendant to be conducting business at that place. This is apparent from the service statute for patent cases, now codified at 28 U.S.C. § 1694. That provision originally appeared as the second sentence of a two-sentence statutory section whose first sentence is now the patent venue

statute, 28 U.S.C. § 1400(b). Thus 54 Cong. Ch. 395, 29 Stat. 695 (1897), provided:

> [I]n suits brought for the infringement of letters patent the circuit courts of the United States shall have jurisdiction, in law or in equity, in the district of which the defendant is an inhabitant, or in any district in which the defendant, whether a person, partnership, or corporation, shall have committed acts of infringement and have a regular and established place of business. If such suit is brought in a district of which the defendant is not an inhabitant, but in which such defendant has a regular and established place of business, service of process, summons, or subpoena upon the defendant may be made by service upon the agent or agents engaged in conducting such business in the district in which the suit is brought.

54 Cong. Ch. 395, 29 Stat. 695 (1897) (emphasis added).[4] Thus, the venue and service provisions were not just enacted together but expressly linked, and both have always required that the defendant have a "regular and established place of business." *Id.*

What the service statute indicates about that phrase must inform the proper interpretation of the same phrase in the venue statute. Interpretation of a provision must take due account of "neighboring statutory provisions," *see United States v. Tinklenberg*, 563 U.S. 647, 664 (2011), and "we normally presume that the same language in related statutes carries a consistent meaning," *United States v. Davis*, 139 S. Ct. 2319, 2329 (2019). Here, those principles require that the service and venue statutes "be read

---

[4] The currently codified venue and service statutes use "resides" and "resident" in place of "inhabitant." *See* 28 U.S.C. §§ 1400(b), 1694.

together." *Id.* at 2330. The service statute plainly assumes that the defendant will have a "regular and established place of business" within the meaning of the venue statute only if the defendant also has an "agent . . . engaged in conducting such business." Likewise, the provision that "service . . . may be made by service upon the agent" and the "regular and established" character of the business assumes the regular, physical presence of an agent at the place of business. In the absence of a contrary indication, these assumptions must govern the venue statute as well.

There is no contrary indication. Indeed, "[t]o the extent any doubt remains about Congress' intent, the legislative history confirms what the plain text strongly suggests." *Boumediene v. Bush*, 553 U.S. 723, 778 (2008). The Congress that enacted the venue statute stated that the "main purpose" of the statute was to "give original jurisdiction to the court where a <u>permanent agency transacting the business</u> is located." 29 Cong. Rec. 1900 (1897) (statement of Rep. Lacey) (emphasis added). Furthermore, that Congress explained that only a "permanent agency"—and not "[i]solated cases of infringement"—would be enough to establish venue. *Id.* Congress' characterization of a "regular and established place of business" for venue purposes as a "permanent agency" reinforces the applicability to venue of the agent requirement of the neighboring service provision.

SIT argues that an amendment to the venue statute in the America Invents Act ("AIA"), Pub. L. 112-29, § 18(c), suggests that the venue statute has no requirement that an employee or agent must be present at the defendant's place of business at all, much less regularly conducting that business. The amendment states that for a patent infringement action involving a covered business method patent, "an automated teller machine shall not be deemed to be a regular and established place of business" for the purposes of establishing venue under § 1400(b). AIA § 18(c). We do not see why this amendment, which makes no

mention of an employment or agent requirement, should alter our analysis.

We conclude that a "regular and established place of business" requires the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged "place of business."

III

The question then is whether Google had an employee or agent with a regular, physical presence at its "place of business" and whether that employee or agent was conducting Google's business. The record is clear that there is no Google employee conducting business in the Eastern District of Texas. However, there is nonetheless the question of whether the ISPs are acting as Google's agent.

An agency relationship is a "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act." Restatement (Third) of Agency § 1.01. The essential elements of agency are (1) the principal's "right to direct or control" the agent's actions, (2) "the manifestation of consent by [the principal] to [the agent] that the [agent] shall act on his behalf," and (3) the "consent by the [agent] to act." *Meyer v. Holley*, 537 U.S. 280, 286 (2003).

Google contracted with two ISPs, Cable One and Suddenlink, to host its GGC servers. The contracts stated that, for each ISP, Google would provide the ISP with GGC server equipment, which the ISP would install and host in server racks within its datacenter. The contracts contemplated that the ISP would perform three functions.

First, the ISP provides the GGC servers with network access, i.e., a connection to the ISP's customers, as well as the public Internet. The ISP provides Google with a service, and Google has no right of interim control over the

ISP's provision of network access beyond requiring that the ISP maintain network access to the GGC servers and allow the GGC servers to use certain ports for inbound and outbound network traffic. In this respect, the ISPs are not agents of Google. *See* Restatement (Third) of Agency § 1.01 cmt. f(1) ("The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents.").

Second, the ISP performs installation of the GGC servers. The contracts with the ISPs stated that the ISP was responsible for the installation of the GGC servers, including "[c]o-ordination with logistics and shipping personnel; inventory of equipment received; [u]npacking equipment; [a]ssembling equipment based on information and instructions provided by Google; . . . [c]onnecting equipment to power strip(s) and Ethernet cable(s); [and] [p]owering up equipment & executing installation scripts configuring IP address information." Supplemental Record, Ex. A at 6; *id.*, Ex. B at 5. Although these provisions may be suggestive of an agency relationship, we do not consider the ISPs performing these installation functions to be conducting Google's business within the meaning of the statute. The installation activity does not constitute the conduct of a "regular and established" business, since it is a one-time event for each server.

Third, the contracts provide that "Google may from time to time request that [the ISP] perform certain services" involving "basic maintenance activities" with respect to the GGC servers. *Id.*, Ex. A at 6; *id.*, Ex. B at 5. The contracts provided examples of these activities:

> physical switching of a toggle switch; power cycling equipment . . . ; remote visual observations and/or verbal reports to Google on its specific collocation [sic] cabinet(s) for environment status, display lights, or terminal display information; labeling

> and dress-up of cabling within cabinet; tightening screws, cable ties, or securing cabling to mechanical connections, plug[s]; replacing existing plug-in only hardware such as circuit cards with spares or upgrades.

*Id.*, Ex. A at 6; *id.*, Ex. B at 5. The ISP's conduct as to these activities is permitted "only with specific and direct step-by-step instructions from Google." *Id.*, Ex. A at 6; *id.*, Ex. B at 5. The ISP is also prohibited from "access[ing], us[ing], or dispos[ing] of the [GGC servers], in whole or in part" without Google's prior written consent. *Id.*, Ex. A at 2; *see also* Ex. B at 2.

Although the maintenance provision, like the provision on installation, may be suggestive of an agency relationship, SIT has not established that the ISPs performing the specified maintenance functions are conducting Google's business within the meaning of the statute. The better reading of the statute is that the maintenance activities cannot, standing alone, be considered the conduct of Google's business.

Maintaining equipment is meaningfully different from—as only ancillary to—the actual producing, storing, and furnishing to customers of what the business offers. In 1897, Congress focused on the latter sorts of activities as the conduct of business. *See* 29 Cong. Rec. 1900 (1897) (statement of Rep. Lacey) (discussing venue in the context of agents performing traditional business functions, such as manufacturing, sales, or direct customer services); *id.* at 1902 (discussing similarities to a law conferring "jurisdiction" to sue agents of an insurance company). There is no suggestion in the legislative history that maintenance functions that existed at the time, such as the maintenance of railways or telegraph lines, constituted "conducting [the defendant's] business" within the meaning of the statute. *See id.* at 1900–02.

We reach our conclusion bearing in mind that, as we noted in *Cray*, the Supreme Court has cautioned against a broad reading of the venue statute. 871 F.3d at 1361; *Stonite Prods. Co. v. Melvin Lloyd Co.*, 315 U.S. 561, 566 (1942) (interpreting the venue statute as "a restrictive measure"); *Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 264 (1961) ("The requirement of venue is specific and unambiguous; it is not one of those vague principles which, in the interest of some overriding policy, is to be given a liberal construction." (quoting *Olberding v. Ill. Cent. R. Co.*, 346 U.S. 338, 340 (1953)) (internal quotation marks omitted)). We also bear in mind the importance of relatively clear rules, where the statutory text allows, so as to minimize expenditure of resources on threshold, non-merits issues, of which venue is one. *See Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1321 (2017); *Hertz Corp. v. Friend*, 559 U.S. 77, 94–95 (2010); *United States v. Sisson*, 399 U.S. 267, 307 (1970). Those principles, and the clear intent of Congress in enacting the statute to restrict venue to where the defendant resides or is conducting business at a regular and established place of business, with agents there regularly conducting that business, lead us to our conclusion. The venue statute should be read to exclude agents' activities, such as maintenance, that are merely connected to, but do not themselves constitute, the defendant's conduct of business in the sense of production, storage, transport, and exchange of goods or services.

If there is dissatisfaction with the resolution we reach, "[t]he remedy for any dissatisfaction with the results in particular cases lies with Congress and not with [the courts]. Congress may amend the statute; we may not." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 576 (1982); *see also BigCommerce, Inc.*, 890 F.3d at 985 ("We cannot ignore the requirements of the statute merely because different requirements may be more suitable for a

more modern business environment. Such policy-based arguments are best directed to Congress.”).

We conclude that the Eastern District of Texas was not a proper venue because Google lacked a “regular and established place of business” within the district since it has no employee or agent regularly conducting its business at its alleged “place of business” within the district.

IV

To be clear, we do not hold today that a “regular and established place of business” will always require the regular presence of a human agent, that is, whether a machine could be an “agent.” Such a theory would require recognition that service could be made on a machine pursuant to 28 U.S.C. § 1694. Nor do we decide what might be inferred in this respect from Congress’ amendment to the venue statute in the AIA concerning automated teller machines. *See* AIA § 18(c).

IT IS ORDERED THAT:

The petition is granted, and the district court is directed to dismiss or transfer the case as appropriate under 28 U.S.C. § 1406(a).

FOR THE COURT

February 13, 2020 /s/ Peter R. Marksteiner
Date Peter R. Marksteiner
Clerk of Court

# United States Court of Appeals for the Federal Circuit

---

**IN RE: GOOGLE LLC,**
*Petitioner*

---

2019-126

---

On Petition for Writ of Mandamus to the United States District Court for the Eastern District of Texas in Nos. 2:18-cv-00462-JRG, 2:18-cv-00463-JRG, Judge J. Rodney Gilstrap.

---

WALLACH, *Circuit Judge*, joining and concurring.

I join with the majority's order, but I write separately to raise questions about Google's business model. During oral argument, Google did not answer, when asked, the question of what its main source of business is in the Eastern District of Texas. Google simply explained that it does not "actively do[] anything. In other words, there's no evidence of any employee or agent . . . being present in the district." Oral Arg. at 51:55–52:15, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2019-126.mp3.

When asked again, "what do you do in the Eastern District?," Google responded that "what Google does in the District will depend on what the subject of that verb is," and "when you look at the service statute the subject of that verb has to be 'employees' or 'agents' in the District." *Id.* at 52:30–52:53. Finally, Google was asked "when you gather information, from customers, which is part of your

business, you agree. How does that get passed back to Google? It goes through the server?" *Id.* at 58:59–59:10. Google's counsel responded stating: "I am not aware. There's nothing in the record that I'm aware of on that point, your Honor." *Id.* at 59:11–59:14.

Given the absence from the record of information sufficient to understand Google's business model, the question remains for the District Courts to determine whether Google's end users become agents of Google in furtherance of its business by virtue of voluntarily or involuntarily sharing information generated on Google's servers. If, for example, by entering searches and selecting results a Google consumer is continuously providing data which Google monetizes as the core aspect of its business model, it may be that under the analysis in which I today join, Google is indeed doing business at the computer of each of its users/customers. Because this is a question I believe should be entertained by District Courts, I concur.